Ms. Blotson, would you call our first case, please? And will the lawyers on Ealy please approach, tell us who you are, who you represent, and how much time you'd like. Good morning, Your Honor. My name is Mike Holligan. I represent the defendant, Courtney Ealy. I'd ask for 20 minutes, Your Honor, if I could have 15, initially in a five-minute bottle. Okay. Good morning, Your Honor. Dan Pupovarchuk on behalf of the people. 15 minutes. Okay. All right. And, Mr. Mulligan, whenever you're ready. Good morning, Your Honor. May it please the Court, Counsel. My name is Mike Mulligan. I represent the defendant, Courtney Ealy, in this matter, who was convicted of first-degree murder in this particular case. We are challenging Mr. Ealy's conviction on five grounds, which are outlined in our brief. And I know Your Honors have read the briefs. The first basis is that there was insufficient evidence to support a conviction, that Mr. Ealy was convicted of murder either as a principal or as an accomplice. The jury was only instructed on first-degree murder, right? Yes, Your Honor. So when you say convicted as an accomplice, the jury wasn't asked to decide that, right? Correct. That is correct, Your Honor. But I do believe that there was insufficient evidence to convict him as a principal as well. The second basis of our argument, Your Honor, is that the prosecutor made improper statements in his closing argument wherein they referred to my client, Mr. Ealy, and his co-defendant, Massey, as shooters. We believe this was highly prejudicial and warrants a new trial. The third basis was that the trial court abused its discretion in extending Ealy's speedy trial term. The fourth basis was Ealy's 38-year sentence was excessive. And the fifth was Ealy was denied a fair trial because the prosecutor in the opening statement improperly referred to the victim's family. For today's discussion, I was hopeful we could focus just on the first two grounds, that the State failed to prove beyond a reasonable doubt that Mr. Massey engaged in the crime of murder. Mr. Ealy. Mr. Ealy, excuse me. Mr. Ealy. And secondly, that the State made prejudicial error when they referred to Mr. Ealy and his co-defendant as shooters to support their theory of the case. With the insufficiency of the evidence case, as Your Honor is aware, the standard of review is whether the trial evidence viewed in the light most favorable to the State is sufficient to find a conviction for first-degree murder. Mr. Ealy was found guilty of first-degree murder, but as we noted the jury also found that the State had failed to prove that he was armed with a firearm during the commission of the offense. Well, we don't know why the jury made that finding. We don't know that why. Could have been surrelinity. It could have been anything. Correct. But we think in conjunction with that finding as well as all the evidence that I'm going to discuss today that there was insufficient evidence to support that Mr. Ealy was guilty of the crime of murder as a principle. Contrary to what the State argues, we're not arguing that because of the firearm enhancement finding that this verdict should be overturned because it's inconsistent. Rather, we're asking that Your Honors look at all of the evidence that was presented at trial and based on all of the evidence we believe there was insufficient evidence to convict him of murder. And so we have Herbert, who denied at trial knowing anything about the shooting, but who told police that it was Ealy who had the gun, right? No, she said it was Massey. Herbert identified Massey to the Assistant State's Attorney as the shooter. I think you're referring to Caprice Johns, who was the one that identified my client as the shooter. One or the other. There was a witness who said that. If we look at that in the light most favorable of the State, how is that insufficient? Even if it's contradicted. Her testimony was contradicted not only by the evidence, by the other witnesses, but also by the videotape. A videotape that shows a flash coming out of your client's hand? Correct. And the reason it was inconsistent, if you recall her testimony, she indicated that there was three individuals that got out of the car. My client, Massey, and the gentleman that she referred to as D. Rose. And in that video, there is not three individuals that were at that car. So her testimony is not only contradicted by video, okay, but she gave four different versions of what happened that night. Okay. So that's an argument that the jury shouldn't believe her, and that was the argument made to the jury, right? Yes. And I believe, Your Honor, we cite a case where there's one witness, eyewitness in people versus case, that is so unreliable, okay, this court has the opportunity to overturn that conviction if the testimony is based on one witness. In this case, there was one statement that she gave to the police that was inconsistent with her initial statement to the police right after the incident when she returned to retrieve the iPhone. The first time she told the police that it was a black gentleman with dreadlocks driving a minivan. And then when she was taken into custody, her first version to the police was that she wasn't there, she was with a friend. Her third version was Ely shot the dude, if you remember that in the testimony, when she was faced with being charged as an accessory to murder, and she was being held 72 hours. Her vehicle was being held as hostage. And then her fourth version was at trial. But she was under oath, and she said she didn't see who shot her. Didn't know anything. Didn't know anything. She just saw a flash and saw a dude jumping. It happens all the time. But if this court's going to accept one witness, one statement, and when Ms. Herbert's testimony, it was Massey, was the shooter, which is consistent with the video. Massey's testimony, or excuse me, Herbert's, what she stated to the assistant state's attorney, is consistent with what is shown in the video. There was two individuals that approached the car. And she gave the statement to the assistant state's attorney, there was four or five shots into the car, which is consistent with the ballistic evidence that was presented by the state through their expert witness. And so we've got E. Lee being on a speakerphone, and the people in the car recognizing his voice. Correct. When Ms. Johns said, we've got to go take care of this issue at the party. At the party. Then we've got him getting back into the car, or is it when they meet up at the gas station after, and he says, man down, meaning the guy's dead. That was obviously after the shooting. So we're not just talking about Caprice Johns telling four different stories, we're talking about a lot of evidence about Mr. E. Lee's involvement in this murder. Right. And if you believe that by him saying, where are you from, man down, is sufficient to support a finding that he was guilty of murder, I would suggest, I disagree, respectfully disagree. The way Mr. E. Lee refers to where you're from and man down saying someone got shot, in my opinion, doesn't support a conviction for murder. What we've got is one person that gave one statement to the police that she gave three different versions of what happened. But what we have is Ms. Herbert, who also denied that either E. Lee or Massey was present at the scene, but then she gave a detailed typewritten statement to the assistant state's attorney, which is consistent with the ballistic evidence and which is also consistent with the video. And then we've got a third occurrence with this, Jasmine Brown, who also did not see who shot the victim. So that, again, the only witness, or the only testimony, or the only evidence, I should say, that Mr. E. Lee was the shooter was Ms. Johns, who was in custody, had repeatedly lied to the police, and was threatened to be charged herself. Moreover, she denied at trial even seeing a gun involved in this shooting. And, again, I know Your Honor have seen the video, but I think the video is consistent with Mr. Massey being at the window of the victim's car the entire time of this encounter. We're both at the window. At some point during the incident, Mr. E. Lee steps back. Okay? And Mr. Massey continues to stay at the window when the vehicle lunges forward and backwards, if Your Honors remember. We believe that the inconsistent evidence that Mr. E. Lee was the shooter warrants a reversal. Again, I've told you all the different versions that Ms. Johns gave to the police and to the trial court. We're asking the court then to go to the next stage of the analysis. Was there sufficient evidence to convict Mr. E. Lee under the law of accountability? Again, the law of accountability says that either before or during the commission of offense, and with the intent to promote or facilitate that commission, the defendant either solicits, aids, abets, or agrees to attempt to aid that person in the planning or commission of the offense. But I guess I started out by asking you, he was only charged and the jury was only instructed on first-degree murder. They weren't given that instruction on accountability, and they weren't asked to find whether he was accountable for Massey's conduct. I believe the State did argue throughout the closing argument that what E. Lee did, Massey's responsible for. They certainly argued that they acted together, which is corroborated by the video, but the jury wasn't asked to find either one of them guilty on an accountability theory, were they? I don't believe so, Your Honor. But I do believe they argued that throughout the closing that they were one and the same. Mr. E. Lee was accountable for whatever Mr. Massey did, and they would not commit to who was the shooter. The State even conceded that in their brief. Do they have to? What says that they have to commit to? I don't know. They have alternative. I think they can argue in the alternative, certainly. But I also suggest to Your Honors that you can consider alternatively that they failed to prove my client either as the principal or as the accomplice, as the State argued to the jury in this particular case. And if you remember, they repeatedly talked about what this common plan or design was. This was to go back to a party at Wentworth Gardens to get at the girls, according to Ms. Johns, because some group of girls, pretty in pink, if you remember, played a song that was too slow for the rest of the group, and as a result, shots got fired up in the air. You know, we've seen a lot less motive for that, sadly. Understood. But what I would point out that Mr. E. Lee and Mr. Massey weren't even at the party when this incident occurred. They had nothing to do with the argument. But that was the State's theory, that this was a revenge shooting for something that happened at a party where my client wasn't even involved. And then somehow that theory of the case then morphed into, rather than going to the party and addressing the girls, which Ms. Johns said they were going to do, resulted in an abrupt stop at 37th and Princeton where a taxi driver, or I think it was a Jiffy driver or whatever they, I don't know, or Uber driver, had nothing to do with the incident and just morphed into a thrill kill. Again, how did, was there any sort of common criminal design with that? Did the State present any evidence that this morphed into a common theme or design? You've got the conference call, the speaker phone call, where they complain about what happened at the party and they hear E. Lee's voice saying, you know, we'll meet you and whatever. They all go back there together in a caravan and they all meet up at the gas station afterwards, you know. It's not like your client was a bystander. He just happened to be at the corner when these other people rolled up. He rolled up with them. He rolled out with them. He had something flashing coming out of his hand and a man wound up dead. Understood. I would respectfully agree that something was flashing out of his hand. I watched the video again this morning. Yes. It's grainy. I certainly, when I watched it again this morning, I did not see anything flashing. But again, admittedly, Mr. Ivey, the evidence is, was involved in a call that he was informed of this altercation, when I say altercation, argument at this party. But there was no evidence that he signed on to some sort of a common scheme or design to go retaliate. Well, why can't a reasonable jury draw that inference from the fact that he gets into a caravan of cars? And you see them on the video. They're going down the street one way. They see the person sitting in the car. They turn around. They come back, pull up right next to him. He and Massey get out, go over to the window, and the guy's dead. Because the evidence in this case that the State put forth was Ms. Johns testified they were going back to the party to deal with the girls. And that's the common design that the State presented. There's imperfect revenge all the time. And then somehow that common scheme or design, according to the State, when either Mr. Ivey or Mr. Massey both decided to discontinue that plan, jump out of a car and engage in the thrill kill of someone who just happened to be in the wrong place at the wrong time. Again, the State presented no evidence that my client was aware of this before the incident. And that's what they failed to prove. The intent that my client was aware that this was going to happen. There's no evidence that my client knew that Mr. Massey had a gun, as Ms. Herbert testified, or as she indicated to the State when she spoke to Mr. Waller, and he shot her. There's no testimony or evidence that my client was aware that this was going to happen. Again, my client to be convicted under a conflict of liability had to be aware of this common plan or design and aid or abet in it. Again, I would suggest to your honors, there was no evidence that he signed on to this plan. At most, if you believe they were going back to the party, that was to get back at the girls. And that's the first inference that the State argued to the jury, was that Ely signed on to this plan to return to the party and deal with the girls through some sort of criminal activity. If you remember Ms. John's testimony, it was go back to the girls and deal with them. There was no talk about what deal with them meant. There was a strong inference that that meant some sort of criminal activity. The second inference that the State argued in this case is that Ely and Massey then decided at some point to discontinue this plan, to go back to the party and instead engage in some sort of a thrill kill against the unfortunate victim who's driving a taxi cab. Again, those are two inferences that the State relied on in trying to convict my client of this crime. And as your honor knows, you know, inferences can be made, but they have to be based on reasonable inferences. Your speculation, guess, conjecture is something the jury can't do. And I would suggest to your honor that we have inference upon inference at some point and more into some sort of pure imagination in this particular case. But what the jury can do is assess the credibility of the witnesses and the testimony that they give. And you've got some conflicting evidence here. It happens all the time. Correct. And that leads me into my next point. And the reason they kept grouping Ely and Mr. Massey together is because they wanted to promote this common theme or design. And the way they did this is they improperly argued in closing that my client and Mr. Massey were known as shooters. Okay? They were known as shooters. They referred to them as the shooters. And that's why they called them. They called these girls. The girls called Ely and Massey because they were their shooters. And I believe that was almost not an exact quote, but pretty close to what was said. Now, this was before the shooting. Okay? There was no evidence that my client had ever shot anybody, that Mr. Massey had ever shot anybody, that my client had a gun, that my client was known as a hit man. They created this false narrative to support this common design or theory of the case. And, again, this was out of pure imagination. Nothing in the record supported that argument. On the video, is there anything that shows that your client pushed Massey out of the way, grabbed the gun out of his hands, did not open the car door, did not stand there while the victim was being shot, did not say, hey, someone call the police, did not, I don't know, whatever? Well, certainly from the video, which Your Honor has seen, it didn't appear that my client did anything to stop what was going on. He stood there to the side. Initially, he was down at the window. And he opened the door. Well, I don't think he opened the door. There was testimony that he touched the window and there was an attempt to open the door. Fingerprint was on the door. I think it was on the window of the door, correct. Okay. So a reasonable jury could guess from all of this that he accepted the fact, even if, according to your argument, he wasn't the guy with the gun and he wasn't the guy that was doing the shooting, he didn't do anything to stop it. Okay. Agreed. And what crime did he sign on to? Again, in this particular case, the crime, according to the State, was to go back to, if you believe their theory. To take care of the girls. To take care of the girls. And then all of a sudden now we're talking about a taxi driver that's parked on Princeton 37th. An unmarked taxi. Didn't have a taxi. Right, right, right. Dome light or anything. So when did he sign on to this plan? And where was there evidence that he had the intent to engage in some further criminal activity that Mr. Massey engaged in? According to your logic, standing next to Massey, well, Massey shot this guy. Massey shot this guy and not trying to stop him. Not trying to prevent the act. Not trying to call the police. Not trying to push the gun out of the way. Not trying to do anything. Isn't that enough? Well, I think in Peoples v. Fernandez, the court said that the defendant can be held accountable. And in order to be held accountable, he must have been committed to furtherance of the crime that was planned or intended. When they walked up to the car, what were they planning? I don't know. There was no evidence of what was being planned or intended. Why would they walk up to the car and say, hey, are you from here? I don't know. And I don't think the jury knew. And the state, their argument was that this plan to go back to the party then somehow morphed into just a thrill kill of anybody from Wentworth Gardens. Again, at one point it was go to the party. Now we're going to shoot whoever is from that neighborhood. Again, was there any evidence that my client, Mr. Ely, signed on to such a common design or theory of the case? Again, I think it was based on inference and speculation and improper argument made by the state's attorney that when he referred to my client as a shooter. He went over there with them. He was right there when it happened, whether you accept that there was a muzzle flash coming out of his hand, whatever, to get back in the car and go back out, leave together. It's not like he just happened to be there and maybe knew this alleged shooter, the other defendant in this case. You know, you're going there when it happens, leave together. Never made any attempt to disassociate himself from anything that you say he didn't sign on to. As if he had to sign on to anything. Well, I think you have to do something in furtherance of the crime, okay, that was intended. And the crime that was ultimately committed was murder. And that's where I don't think the state provided the necessary elements under accountability as an accomplice. Either the criminal intent, shared criminal intent of the principal, or the common design. So was there any objection raised at trial to the shooter comments? No. Was it included in a post-trial motion? I do not believe so, Your Honor. So how is it not forfeited? Under the plain error rule, Your Honor, which we cite in our. . . Two words in a closing argument. They're shooters. But it was. . . You get they're shooters. No objection, not included in a post-trial motion, plain error. But it was so instrumental to the state's theory of the case that by referring to them as shooters, that's why they called these guys. . . It was so instrumental that defense counsel didn't. . . They missed it. . . need to stand up and say I object. As I know, Your Honor, to trial cases. . . How is that not hindsight? Many, many, many lawyers in closing argument will miss objections. Right. How is it not hindsight? I don't think it's hindsight. But what I think, if Your Honors read the transcript, and the state argues that there's wide latitude that prosecutors can make in their closing argument, and tried to argue that they were characterized as shooters because they were actually the shooters in this case. That's not the context in which the state brought out this argument. They brought out the argument that they were recruited. They were enlisted because these were known shooters. These were the hit men. Again. . . They didn't use that phrase. I mean, the evidence is these two guys went up to the side of this car sitting there. Undeniably, they shot into the window, and the guy was killed. They were the shooters. I respectfully disagree that there was sufficient evidence that my client was the shooter. Were they going to give a cigarette or something? I don't know. There was no evidence what was actually being done at the vehicle, other than the state's inference that this was just morphed into a revenge killing of someone from the area of Wentworth's Gardens. Again, there was no evidence what they were actually doing. No witness was asked by the state, why did Mr. Eadie and Mr. Massey go to the car? Were you aware of a plan ahead of time? Anything like that. Again, there was inferences made by the state, and I don't believe that the jury's verdict can be based on a reasonable inference, but not inference upon inference upon inference. And again, I think there's three inferences here. One is that they signed on to engage in a criminal activity to go back to the party to deal with the girls. The second inference is that that somehow changed in the course of driving the party into engaging in a thrill kill. And the third inference that they made, it was more than an inference, it was an argument, that my client was recruited as a shooter to avenge some sort of prior altercation that he had nothing to do with, that he was not even aware of until after the party. Again, reasonable inferences can support a conviction. But unreasonable inferences upon inferences, in my opinion, Your Honor, cannot support a conviction in this particular case. For those reasons, Your Honor, we're asking that Your Honors overturn the conviction. the state's improper arguments at enclosing that refer to Mr. Ely as a shooter. Thank you. Thank you. Mr. Pobocik, did I say your name correctly? Pivo Vartech. Pivo Vartech. I'm sorry. Please. May it please the Court. The jury in this case was instructed on accountability. That's in the report of proceedings at I.I. 44 to 45. What the jury was not instructed on is personal discharging of a firearm. The sentence-enhancing allegation that was presented to the jury was only for possessing a firearm, being armed with a firearm, which did apply to both defendants regardless of who had the gun. However, the personal discharging allegation was not presented to the jury. Accountability, however, was. And that was a fundamental aspect of this case, Your Honor, because the truth is that this was a situation where Ely and Massey were equal partners. They were. The jury was only asked to find on first-degree murder as to both, right? And they were also presented a sentence-enhancing allegation that they were, that they or someone that they are legally responsible for was armed with a firearm. The personal discharge of the firearm and personal discharge causing great bodily harm or death, those allegations were in the indictment, but those were nollied before trial. Okay. And the difference is the amount of time that otherwise would have been given. That's correct. Mandatorily, there would have been more time given. That's absolutely correct. And with regard to Defendant Ely, the jury returned a general verdict of guilty on first-degree murder, and that was absolutely based off of, as Your Honor has explored, the direct evidence of him being the shooter. But I'd like to focus on accountability specifically because this is a case where Ely and Massey were equal partners in an absolutely senseless murder of Javon Boyd. There is absolutely common criminal design here. Ely and Massey led a group of individuals who were upset about a prior shooting at a party in a three-car caravan. They were upset about the music that was played at the party. That was what was said. And it was a shot in the air. Multiple shots. Okay. And, yes, Your Honor, it was an argument between some girls from Wentworth Gardens, Pretty in Pink, and the girls associated with these defendants over how loud the music was. And it got to a point where people at the party discharged a firearm repeatedly, and the friends of Ely and Massey were forced to duck down, and they immediately left the party. So this was an intimidating thing. They were upset and angry by their own testimony. This is the testimony of Caprice Johns and Jasmine Brown. They're upset. They're angry. They make this phone call to Ely and Massey, who are still with Herbert at that point in time, and they all meet up at this Wendy's. And then from the Wendy's, it is. It's a three-car caravan of people who are upset about what happened at that party at Wentworth Gardens. They drive from 55th Street to 37th Street where the shooting takes place. And when they get to that point, both Ely and Massey get out of the lead vehicle in this caravan, and both Ely and Massey approach the passenger side door of the victim's vehicle. And at that point we know, based off of what Ely told both Johns and Brown, that Ely asked the victim whether or not he was from the part of Wentworth Gardens where the party had been, quote, 39th Street, unquote. That's where the earlier gunfire had happened. And when the victim said yes, he unintentionally made himself a target of the shared revenge scheme that these two defendants were leading. So Mr. Mulligan's willing to say everybody's going back there to deal with Pretty in Pink because they're mad at that group of girls. But how does that transform into murdering this man who happens to be sitting in a car on the street? Because you have a common criminal design. You have an intent, a shared intent, to commit some criminal act in retaliation. In this case, they were retaliating to gunfire, and it's an absolutely appropriate inference that they were returning armed to respond to gunfire with gunfire. And in this particular case, you don't have to show that they set out specifically to kill this Jiffy Cab driver. It's the shared criminal design of violent criminal retaliation. It was Ely that the girls called, right? Ely and Massey were together at the time, and there's some lack of clarity with at least some of the witnesses about who was exact – whose phone was called and who was actually talking. Ely was – there is testimony that Ely was talking. That's correct. That's absolutely correct. There's also testimony that Ely dropped his phone at the scene. You're absolutely right about that, and I think that that's – I would like to transition to that because you brought up the fact that during this incident, Ely did not, you know, try to stop Massey or, like, call the police or something like that. And, in fact, the evidence shows that he did the very opposite of calling the police. He worked with two of these girls from the caravan to conceal his presence at the crime scene by returning to the crime scene with them and having them – having Caprice Johns specifically try repeatedly to get access to the crime scene by presenting herself as a girl who had just randomly lost her cell phone but was a witness and wanted to retrieve it. And Ely shows that – by engaging in this, Ely shows not only that there's a common criminal design that's shared amongst these people, but also that he's part of it because he's actually helping them – helping Caprice Johns lie to the police. Well, why isn't that after the fact saying, oh, nuts, I lost my phone, I better go get it, after the fact, after the shooting? It is after the fact, but – So what he does after the shooting isn't part of the common design before the shooting. It shows the subsequent acts – It can show that he screwed up. He dropped his phone, and he recognized it, and he needed to get it back. But I'm having trouble figuring out how having his phone at the scene of the crime shows that before the crime he had a common plan to shoot this guy, this particular guy. Because he's trying to avoid punishment and conceal his involvement. And if he was not a part of this – if he was not part of this common design, if he was just a bystander, he would be able to say to the police something very close to what Caprice Johns was trying to pass herself off as, which is, I was a witness, I didn't have anything to do with this, and while this was happening I dropped my phone. Now, would that get him his phone back right away? I doubt it, but – Even the dopiest criminal, once he drops his phone at a crime scene, is going to think to himself, hey, I better get that back somehow. That doesn't show that he was part of the common design to commit the crime. It just shows that he's like, oh, nuts, I better get that evidence out of there after the fact. So I'm having a little trouble with your common thread argument. I think it's certainly important to not view just one piece of this story outside of the context of the whole thing. So I think that it's important to keep in mind that the people that he tried to get this phone back with were also in that caravan originally. We know there was a phone call. We know it was his voice. We know there was a caravan. We know these guys got out of the car. We know they approached the victim's car. Yes. After that, so they shot the victim four times after the door was open. Someone shot the victim. One of those two individuals. We don't know if there were one gun or two guns. The testimony does not say, but there was one. It appears from the video that the flash was from one gun, and I think it's impossible to tell. It might have been two guns, such as the forensic testimony was. There could have been two guns. That's correct. We don't know. And no guns were recovered. Is that a correct statement? That is also correct. But bullets were recovered and also cartridges were recovered. That's correct. But they couldn't tell whether the bullets came from those cartridges because of the way guns are fired. That's exactly correct. Okay. So we still don't know who actually pulled the trigger, but what you're saying is we know that Ely didn't do any – if Ely wasn't the shooter, that Ely didn't do anything to try to stop the shooting. And that still doesn't tell me how they arrived at the door of this car with the common design to kill the driver. What if Ely wasn't the shooter and Massey was just crazed, pulled out a gun from his pocket and started shooting? What could Ely have done? Well, what he wouldn't have done is then get back in the lead car with Massey because if Massey's just suddenly murdered someone unexpectedly, why would Ely then, as you see in the video, immediately go in the back seat with this wild shooter? The reason that – Well, it's after the fact, though. That's not a common design before the fact. This is – it's immediately after the fact, and it's revealing about what is in his head at the time and before that because of the fact that you're not going to, without statements, you're not going to have direct evidence on what people knew and what people intended. So you do have to look at the circumstance of evidence. All that shows is that after someone shot the poor victim, that Ely wasn't the shooter. He and his pal jumped in a car to try to escape because they both knew the sky was falling. But that doesn't show that before the fact they planned to shoot this man, that there was a common design to shoot this man. It might have been a common design to go up to the apartment and shoot some of those girls, but how are you getting to the point where there's a common design to shoot this man before the shooting? It's important to keep in mind that we're looking at all of this in the light most favorable to the prosecution. This is a sufficiency of the evidence argument. And so the inferences that I'm describing are absolutely reasonable inferences. Now, could there be other arguments? Certainly. But that's not the question here. The question is whether or not any reasonable finder of fact could have found that Courtney Ely committed the essential element of first-degree murder under any theory that was presented to the jury, both as the principal and as an accountable party. Does it have to be a common criminal design to shoot this man? No, it was not a common criminal design to shoot this man. It was a common criminal design to retaliate. Yes. And to retaliate with criminal activity, to return gunfire with gunfire. It doesn't have to have, as Your Honor is pointing out, it doesn't have to have the specifics of who the ultimate target is. And we know that the victim in this case, as innocent and uninvolved as he was, his answer to Ely's question caused Ely to consider him to be an appropriate target of revenge on this party. So there absolutely is. Whether that's rational or not, right? Whether it's rational or not, it's certainly reasonable for the jury to accept. I'd like to discuss the issue of referring to the defendants as shooters in closing argument. Because Johns absolutely identified Ely in the photo array as the shooter. Herbert identified Massey in a photo array and in a written statement to an assistant state's attorney as the shooter. They are in different vehicles. They have different vantage points of the actual incident. The jury was absolutely free to reconcile that evidence, Johns and Herbert, to reconcile that evidence and conclude that the gun was passed between the two of them, which is an argument that was presented to the jury. And it would absolutely be reasonable that they both fired shots into this victim in retribution for the gunfire that had happened at the party previously. Thank you. If there are no further questions, for the reasons presented in my brief as well as now, we ask that you affirm the defendant's conviction and sentence. Okay. Thank you, Mr. Pibovarczyk. And, Mr. Mulligan, your rebuttal. Just a couple points. First, the State, again, has failed to explain or justify the reference to my clients as shooters in the closing argument. They were not, again, they were called shooters before the shooting occurred. They were not, the State did not argue that they're shooters because they shot the victim. They argued to the jury that they were enlisted to retaliate because they were as known shooters. They got a call. Ely's put on speaker phone. He's told about what happened at this party and we've got to go back. He signs on. He and Massey sign on. They show up there and the guy sitting in the car is shot. So why is there not a reasonable inference from that that they were called because these women wanted to exact revenge by shooting somebody? But there was no evidence that they had a reputation for violence. They had a reputation for being a shooter. And that's the context in which it was presented to the jury. To call them shooters saying that they ultimately shot the victim. They called their shooters. They went and shot the guy. They called their shooters. Why isn't there a fair comment on the evidence? Because it was before the shooting occurred in which the State argued as to why they were called. And, again, if it's so devastating, if it's so central, if it's so improper, objection. Or post-trial motion. Instead the mute button is hit twice. And now here it's all important. Well, I do think it's important because if you think about the theory of their case and how it changed, okay, from just we're going to go back to the party and deal with these girls, and then into a random shooting or a thrill kill, that the State had to have some sort of a theory to justify this because they were known shooters. Again, the common theme of design. Or they acted upon a mistaken belief. You from over there. That meant he was part of the incident. So they were wrong. Whatever. A man wound up dead. Absolutely. And your Honor correctly notes that the question was, as presented at the trial, was are you from over here? Okay. And it wasn't Wentworth Gardens the answer. The answer was yes. Over here was never defined or explained to the jury. It was inferred to the jury by the State. That meant Wentworth Gardens and, therefore, this was a revenge for anybody that happened to be from Wentworth Gardens. Again, that was never presented to the jury that what over here indicated or meant. But your entire argument seems to be that we are to disregard any number of reasonable inferences from the evidence presented to this jury, and the jury is the body that is to evaluate the credibility of the witnesses to see if there's enough coming from each individual witness to prove beyond a reasonable doubt that they're guilty. And we're looking at it from the State's point of view. Here. I don't believe all the State's inferences were reasonable. And I pointed out. I'm sure you don't think any of them were. And the first inference is that they signed on, Mr. Ealy signed on to a common scheme to engage in criminal activity because Ms. Johns merely said they were going back to the party to deal with the girls. That's the first inference that there was criminal activity planned about. Are they going back to hear Pretty in Pink again? I don't know. It wasn't explained. Maybe for the first time. Again, we're speculating here. But that's the State's. What about Mr. Pivovarczyk's point that the insult here was not the music that was played. It's the shots that were fired that caused the non-Wentworth girls to duck down and run out of the party. And when they did that, they were embarrassed. They got shooed out of a party by somebody shooting a gun into the air. And they were upset about that. And they decided to go back and take care of business. Right. And, again, that's their theory of the common design. But what I was challenging is how did that common design or theory then morph into a random thrill killing of a taxi driver? Again, I don't believe the State. Because he was from Wentworth Gardens. I don't believe the State has provided evidence that my client, Mr. Ely, signed on to such common design. That he knew that this was going to occur. Rarely does the State have access to that. Rarely does the State have a statement among people who act pursuant to a joint criminal plan that, yes, this is what I'm planning to do. Do you want to join me? Yes, I will join you. Let's go. Let's go do it. It's usually inferences. I understand. But they do have to approve under accomplice liability a shared common design or scheme or shared intent. I don't believe they did it in this case. The last point I'm going to make is what Mr. Ely did after the fact with the iPhone I think is irrelevant to the analysis. What is relevant is what he did prior and up until the time that we believe Mr. Massey shot the victim to support whether he should be convicted or his conviction to stand as an accomplice under accomplice liability. Thank you. Okay. Thank you both for your briefs and your argument here this morning. We will take the case under advisement and stand in recess briefly to change panels.